UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CHARTER COMMUNICATIONS ENTERTAINMENT I, LLC d/b/a CHARTER COMMUNICATIONS, | ] ] ] ] ] | CIVIL ACTION NO. 04-40064-FDS |
| v. | ] ] | |
| INES CINTRON, Defendant | ] ] | |

|  |  |  |
|---|---|---|
| CHARTER COMMUNICATIONS ENTERTAINMENT I, LLC d/b/a CHARTER COMMUNICATIONS, | ] ] ] ] ] | CIVIL ACTION NO. 04-40081-FDS |
| v. | ] ] | |
| DENNIS SOSA, Defendant | ] ] | |

|  |  |  |
|---|---|---|
| CHARTER COMMUNICATIONS ENTERTAINMENT I, LLC d/b/a CHARTER COMMUNICATIONS, | ] ] ] ] | CIVIL ACTION NO. 04-40098-FDS |
| v. | ] ] | |
| THOMAS A/K/A TOM BURDULIS, Defendant. | ] ] ] | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF REQUEST FOR RECONSIDERATION OF ORDER ON DEFAULT JUDGMENT AND REQUEST FOR ORAL ARGUMENT**

**Introduction**

Plaintiff Charter Communications Entertainment I, LLC d/b/a Charter

Communications ("Charter") seeks partial reconsideration of the Court's January 11,

2005 Memorandum on Plaintiff's Motions for Default Judgment ("Memorandum") with

respect to three defaulted cable signal-theft defendants pursuant to 47 U.S.C. §§ 553

("Unauthorized reception of cable service") and 605 ("Unauthorized publication or use of

communications").  The Memorandum extensively discussed legal issues relative to the

amount of damages to be assessed, and determined, *inter alia,* that (1) § 605 is

inapplicable to theft of cable signals transmitted "over a cable wire" (Memorandum at 5-

13); and (2) the Court would adopt a policy of determining civil damages under

§ 553(c)(3)(A)(II) based on "a reasonable estimate of actual damages" based on the value

of video services stolen rather than awarding the maximum statutory damages of $10,000

or employing some other calculation approach (Memorandum at 13-18, relying on

Comcast of Massachusetts I, Inc. v. Naranjo, 303 F.Supp. 2d 43 (D. Mass. 2004)).

Charter appreciates and acknowledges the Court's careful consideration of the

issues addressed in the Memorandum.  Nevertheless, the above conclusions depart

substantially from over four years of practice and precedent in the Central Division and

are not well supported.[1]  Charter was not afforded the opportunity to assist the Court by

---

[1]      See, e.g., Charter Communications Entm't. I, LLC v. Djan, No. 03-40060, slip op. at 1 (D. Mass. Oct. 24, 2003) ("Charter Communications Entm't I, LLC" hereinafter as "Charter"); Charter v. Mroczka, No. 03-00009, slip op. at 1 (D. Mass. July 9, 2003); Charter v. Srams, No. 02-40108, slip op. at 1 (D. Mass. May 28, 2003); Charter v. Rumrill, No. 02-40220, slip op. at 1 (D. Mass. Apr. 16, 2003); Charter v. Maldonado, No. 02-40221, slip op. at 1 (D. Mass. Apr. 16, 2003); Charter v. Rubert, No. 02-40132, slip op. at 1 (D. Mass. Jan. 27, 2003); Charter v. DeFilippo, No. 01-40222, slip op. at 1 (D. Mass. Sept. 26, 2002); Charter v. Kessler, No. 02-40054m slip op. at 1 (D. Mass. Aug. 13, 2002); Charter v. Wayne, No. 02-40026, slip op. at 1 (D. Mass. May 10, 2002); Charter v. Tetrault, No. 01-40120, slip op. at 1 (D. Mass. Apr. 5, 2002); Charter v. Estrada, No. 01-40171, slip op. at 1 (D. Mass. Mar. 6, 2002); Charter v. Duggan, No. 01-40093, slip op. at 1 (D. Mass. Jan. 24, 2002); Charter v. Fairbanks, No. 01-40149, slip op. at 1 (D.

briefing these issues of critical importance to its anti-theft program in Massachusetts and

other states within its national footprint.[2]  Charter respectfully requests that the Court

take a fresh look at the issues under review and reconsider its conclusions for the reasons

set forth below.

**Argument**

I.       **47 U.S.C. § 605 Remains an Available Remedy for Theft of Radio-Based
         Signals Over Cable Networks.**

         A.       **Introduction**

         The Memorandum reviews the history and text of the principal statutes that

protect communications services from theft or piracy, 47 U.S.C. §§ 553 and 605.  Section

605 is a longstanding, frequently amended, statute that applies to theft of radio

communications involving all federally-regulated service providers.[3]  Enacted in 1984,

§ 553 protects against theft of communications services delivered "over a cable system."[4]

The Memorandum concluded that § 605 is not available with respect to programming

---

Mass. Dec. 5, 2001); Charter v. Pantoja, No. 01-40148, slip op. at 1 (D. Mass. Dec. 5, 2001) (awarding
maximum amount of statutory damages plus costs and reasonable attorneys' fees)  (copies are attached
hereto as Exhibit A).  Tetrault, Kessler, and DeFilippo all included a § 605 judgment in addition to a
judgment under § 553.

[2]      Charter's New England area cable systems are based in Worcester, Massachusetts and serve
approximately 350,000 customers in Massachusetts, Connecticut, Vermont, New York, and a few small
systems in New Hampshire where Charter, to date, has not pursued substantial cable theft litigation.  Unless
the Memorandum is reconsidered, Charter would be protected by both §§ 553 and 605 in the three states
within the Second Circuit (e.g., pursuant to Int'l Cablevision, Inc. v. Sykes, 75 F.3d 123 (2d Cir. 1996)
("Sykes II") and only by § 553 in Massachusetts.  In addition to the merits as articulated herein, Charter
contends that Sykes II is the best law from the highest court in proximity to the Commonwealth of
Massachusetts, and it should not be disregarded absent a compelling legal and factual reason not present
here.

[3]      See 47 U.S.C. § 605(a) ("Practices Prohibited").  In contrast to the specific provisions applicable
to common carrier services in Subchapter II or cable communications in Subchapter V of Title 47, the
multi-service nature of § 605 is reflected in its inclusion in subchapter VI ("Miscellaneous Provisions").

[4]      See 47 U.S.C. § 553(a)(1) (defining scope).

transmitted over a cable network.[5]  This conclusion should be reconsidered in light of the

following, more complete examination of statutory text and legislative history.

> **B.    Overview of Grounds Supporting Continuing Availability of
> § 605 to Radio-Based Communications Over Cable Systems.**

Contrary to the Memorandum, available evidence based on statutory text and

legislative history demonstrates that Congress did not intend that the passage of § 553

would preclude availability of § 605 to radio-based cable communications even if

delivered "over wires," for the following reasons.

First, the plain text of § 605 supports its availability to radio-based (satellite-

delivered) cable communications without regard to whether such communications travel

over the wires of a cable network.  Section 605 applies broadly to interceptions of "any

interstate or foreign communication by . . . radio," with "communication by radio" itself

broadly defined as applying to "transmission by radio of . . . signals . . . of all kinds . . . ."[6]

As confirmed by (1) Federal Communications Commission ("FCC") authority over cable

converters and decoders as radio frequency emitting equipment,[7] and by (2) federal court

decisions that applied § 605 to cable communications prior to enactment of the more

specific protection of communications over cable networks in § 553,[8] radio-based

---

[5]    Memorandum at 13 (holding that "§ 605 does not apply to theft of communications transmitted over a cable wire").

[6]    47 U.S.C. §§ 605(a), 153(33) (emphasis added).

[7]    See 47 U.S.C. §§ 302a, 303; see also Letter from Richard M. Smith, Chief, Office of Engineering and Technology, Federal Communications Commission, to John M. Boehm of Dec. 8, 1994; Declaration of John A. Reed, Electronics Engineer, Federal Communications Commission, Nov. 2, 1993 (copies are attached hereto as Exhibit B).

[8]    See, e.g., Ciminelli v. Cablevision, 583 F. Supp. 158, 161 (E.D.N.Y. 1984) (rejecting argument that 47 U.S.C. § 605 is not applicable to cable theft); Cablevision v. Annasonic Elec. Supply, No. CV-83-5159 (E.D.N.Y. Feb. 10, 1984); Cox Cable Cleveland Area, Inc. v. King, 582 F. Supp. 376 (N.D. Ohio

programming of a cable operator qualify for § 605 protection under these definitions. Further, §§ 553 and 605 contain no statutory language that these statutes are mutually exclusive or that otherwise qualifying radio signals would fail to qualify for § 605 protection if transmitted over cable wires.[9]

Second, text elsewhere in § 605 supports the plain meaning analysis that radio-based communications of cable operators over their networks are protected. The § 605(d)(6) definition of "any person aggrieved" with standing to bring civil claims pursuant to § 605(e)(3) includes both "wholesale and retail distributors of satellite cable programming."[10] The term "satellite cable programming" is elsewhere defined as "video programming which is transmitted by satellite and which is primarily intended for the direct receipt by cable operators for their retransmission to cable subscribers."[11] Separately, § 605(d)(6) also confers statutory standing on (e.g., "person aggrieved") status on "any person engaged in the lawful manufacture, distribution, or sale of equipment necessary to authorize or receive satellite cable programming." Congress would not have granted express statutory standing rights under § 605 to "retail distributors of satellite cable programming" (i.e., cable operators) and to distributors of

---

1983); see also Nat'l Subscription Television v. S&H TV, 644 F.2d 820, 820 (9th Cir. 1981) (holding that § 605 is available to operators of a subscription television service for use against signal theft).

[9]    The Memorandum's conclusion (at 7) that the omission of the 47 U.S.C. § 153(52) definition of wire communications is fatal to this plain meaning analysis is not persuasive, as addressed in Section I.C below.

[10]    47 U.S.C. § 605(d)(6) (emphasis added).

[11]    47 U.S.C. § 605(d)(1) (emphasis added).

lawful "equipment necessary to authorize or receive satellite cable programming" (i.e., cable operators) if § 605 protections were intended to be unavailable to cable operators.[12]

Third, persuasive sources of legislative intent confirm that Congress did not intend to preclude cable operators from § 605 protections. These extrinsic sources include the following: (1) Congress in drafting § 553 was both directly aware (as discussed immediately below), and presumed to be aware, of the pre-§ 553 case law in several jurisdictions that had interpreted § 605 as applicable to cable operators,[13] but nevertheless reenacted § 605 without change;[14] (2) the only unambiguous statement in the § 553 House Report that addressed the continuing applicability of § 605 demonstrated support for its continued availability, by clarifying that: "[n]othing in [§ 553] is intended to affect the applicability of existing Section 605 to the theft of cable service, or any other remedies available under existing law for theft of service . . . ."[15] and (3) then-leading Committee members made identical statements in the House and Senate, respectively, confirming the continuing availability for § 605, including that § 553 was intended to "leave undisturbed the case law that has developed confirming the broad reach of § 605 as a deterrent against piracy of protected communications . . ." and that the Committee

---

12    See MediaOne v. E&A Beepers, 43 F. Supp. 2d 1348, 1353 (S.D. Fla. 1998) (affirming § 605 standing to cable operator as a distributor of lawful converters under 47 U.S.C. § 605(d)(6)).

13    See, e.g., Ciminelli, 583 F. Supp. at 161; Cablevision v. Annasonic Elec. Supply, No. CV-83-5159 (E.D.N.Y. Feb. 10, 1984); Cox Cable Cleveland Area, 582 F. Supp. at 376; see also Nat'l Subscription Television, 644 F.2d at 820.

14    See, e.g., Lorillard v. Pons, 434, U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.") (citing from, Albemarle Paper Co. v. Moody, 422 U.S. 405, 414 n.8 (1975); NLRB v. Gullett Gin Co., 340 U.S. 361, 366 (1951); National Lead Co. v. United States, 252 U.S. 140, 147 (1920)); see also Shapiro v. United States, 335 U.S. 1, 16 (1948) (same).

15    House Energy and Commerce Committee, Report on Cable Franchise Policy and Communications Act of 1984, H.R. Rep. No. 98-934, at 83, reprinted in 1984 U.S.C.C.A.N 4655, at 4720 (emphasis added).

intended for "all acts which presently constitute a violation of present § 605 shall continue to be unlawful under that section as amended . . . ."[16]

Finally, the text and legislative history of amendments of § 605 subsequent to 1984 are consistent with the interpretation that Congress intended for § 605 to continue to be available to cable operators.  For example, the 1998 amendment adding § 605(e)(4), which criminalized manufacturing, distributing or dealing in theft devices, made the protections available to all "satellite cable programming."[17]  Furthermore, the legislative history to the 1988 Amendment includes references to the cable industry as a beneficiary of these tough anti-theft provisions.[18]  Similarly, the express expansion of § 605(e)(4) to include theft devices targeting the truly non-wire-based "direct-to-home satellite services" (i.e., Direct TV and Dish Network) were not added to § 605(e)(4) for another eight years, until 1996.[19]  This belated adoption demonstrates that § 605 was not intended to apply exclusively to unwired radio communications, and served an important purpose

---

[16]     130 Cong. Rec. H10439 (daily ed. Oct. 1, 1984) and 98 Cong. Rec. 514287 (daily ed. Oct. 11, 1984) (statement of Rep. Wirth); 130 Cong. Rec. S14285 (daily ed. Oct. 11, 1984) (statement of Sen. Packwood), reprinted in 1984 U.S.C.C.A.N. 4738, at 4746 (emphasis added).

[17]     As discussed above, "satellite cable programming" is a defined term that includes all programming received by cable operators for retransmission to subscribers.  47 U.S.C. § 605(d).

[18]     See, e.g., House Energy and Commerce Committee, H.R. Regs. No. 100-887(II), at 28 (1988), reprinted in 1988 U.S.C.C.A.N. 5638, 5657 (referencing that a study on decryption technologies should involve, among other things, "the costs and benefits of such standard on other authorized users of encrypted satellite cable programming, including cable and Satellite Master Antenna Television (SMATV) systems. . .") (emphasis added); see also id., at 5644-45 (indicating cable industry participation in legislative process from National Cable Television Association (now known as the National Cable Telecommunications Association ("NCTA"), Warner Communications, Inc. and Community Antenna Television Association).

[19]     Pub.L. 104-104, § 205 (a) (added to subsection (e) (4) "or direct-to-home satellite services," following "programming").

in deterring theft of radio-based programming by illegally modified converters for over a decade after the enactment of § 553.

This weight of this textual and extrinsic evidence, considered together, strongly supports that Congress, in 1984 and thereafter, has intended to keep both of the principal anti-theft statutes available to cable operators. Had Congress truly intended to preclude cable operators from relying on longstanding protections in § 605, and limited their remedies to the new and legally untested protections in § 553 remedies, in derogation of pre-1984 judicial authority[20] it would have done so expressly in the statutory text. The Court should respect Congress' policy decision to provide overlapping statutory protections to cable operator with respect to radio-based communications, as it has done in similar contexts.[21]

## C.    The Statutory Analysis in the Memorandum is Flawed.

Given the ever-changing nature of 47 U.S.C. §§ 553 and 605 and predecessor statutes over the past 75 years and technical complexities involving wired and wireless communications signals, it cannot be surprising that courts could reach different conclusions as to the applicability of § 605 to radio-based cable signals. Nevertheless, for the reasons discussed above, the legal and policy arguments strongly favor continued access of cable operators to § 605 for their qualifying services. Similarly, the arguments advanced for the unavailability of § 605 for communications over "wires" in the

---

[20]    See, e.g., Ciminelli, 583 F. Supp. at 161; Cablevision v. Annasonic Elec. Supply, No. CV-83-5159 (E.D.N.Y. Feb. 10, 1984); Cox Cable Cleveland Area, 582 F. Supp. 376; see also Nat'l Subscription Television, 644 F.2d at 820. See also Lorillard, 434, U.S. at 580-81(internal citations omitted); see also Shapiro, 335 U.S. at 16.

[21]    See, e.g., United States v. Crawford, 52 F.3d 1303 (5th Cir. 1995) (rejecting defense of double jeopardy in criminal case where the same conduct fell within both 18 U.S.C. § 2512(1)(b) and 47 U.S.C. § 605(e)(4), which both prohibit the manufacturing or sale of devices for the unauthorized interception of cable television signals, based on Congress's intent to provide overlapping statutory protections).

Memorandum, and in the <u>Norris</u> and <u>TKR</u> cases on which it relies,[22] are flawed and ultimately not persuasive, for the following reasons.

First, the Memorandum's initial statutory analysis (at 6-7) has serious deficiencies. The Memorandum bases its conclusion on the fact that § 605 expressly covers interceptions of "radio signals" but does not expressly cover interceptions of "communication by wire" as defined in 47 U.S.C. § 153(52). Thus, per the Memorandum (at 7) it "seems obvious that § 605 was intended to apply only to the interception of *radio* communications and not to the interception of wire communications, which is defined to include *cable* transmissions." [23] The conclusion that wireless theft is addressed in § 605 and wireline theft is limited to § 553, without overlap, is far from "obvious." It ignores that numerous courts, both before and after 1984, have affirmatively held that § 605 applies to radio communications over cable wires and that this case law was expressly discussed in the 1984 legislative history that enacted § 553 without any exclusionary language and re-enacted § 605 without adding a wireless-only limitation. It also directly conflicts with the statutory text. Section § 605(a) and incorporated definitions articulate its scope in the broadest terms – "<u>any</u> interstate or foreign communication by . . . radio," and "transmission by radio of . . . signals . . . <u>of all kinds</u> . . . ."[24] Limiting § 605 to wireless communications, in the face of these express statutory direction to include radio communications "of all kinds," is directly contrary to

---

[22]     <u>United States v. Norris</u>, 88 F.3d 462 (7th Cir. 1996); <u>TKR Cable Co. v. Cable City Corp.</u>, 107 F.3d 196 (3d Cir. 2001).

[23]     <u>Id.</u> (emphasis in original).

[24]     47 U.S.C. §§ 605(a), 153(33) (emphasis added).

the statutory text.[25]  Moreover, § 605 is a Subchapter VI ("Miscellaneous") provision that potentially could apply to interceptions of any FCC-regulated service involving radio signals within Title 47.  Limiting § 605 only to wireless communications, as the Memorandum proposes, potentially could leave wholly unprotected forms of radio communications over wires that do not qualify for the Subchapter V/cable television-only protections of § 553, contrary to § 605's broad remedial purpose.[26]

Second, the claim in <u>Norris</u> that applying both §§ 553 and 605 to cable communications would "'unacceptably blur[]' the line between radio and wire communications" makes little sense.[27]  Sections 605 and 553 are very different statutes. Section 605 applies to radio communications of all kinds, including but not limited to, certain types of radio-based, satellite-delivered cable television signals.  Section 605 broadly protects from theft radio communications of all kinds and provides for enhanced penalties in § 605(e)(4) for persons who manufacture or traffic in theft devices used to steal radio communications, protections not available under § 553.  Section 553 is limited to services delivered over a specific platform, a cable system,[28] but also protects non-radio services such as local programming, high-speed data using a cable modem, interactive

---

25    <u>Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.</u>, 447 U.S. 102, 108 (1980) ("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.").

26    <u>See</u> 130 Cong. Rec. H10439 (daily ed. Oct. 1, 1984) and 98 Cong. Rec. 514287 (daily ed. Oct. 11, 1984) (statement of Rep. Wirth); 130 Cong. Rec. S14285 (daily ed. Oct. 11, 1984) (statement of Sen. Packwood), <u>reprinted in</u> 1984 U.S.C.C.A.N. 4738, 4746.

27    Memorandum at 10-11 (<u>citing</u> <u>Norris</u>, 88 F.3d at 467-68).

28    <u>See</u> 47 U.S.C. § 522(7) (defining the term "cable system").

10

services, and circuit-switched or internet protocol telephony. That the two statutes have areas of overlap is not going to "blur" their many fundamental differences.

Finally, the <u>TKR</u> argument that the anti-piracy protections in § 553 for wire communications would be largely unnecessary if § 605 applied to satellite-delivered programming[29] misses the point, reflected in the legislative history, that Congress sought to take a "belt and suspenders" approach to ensuring comprehensive tools to address the growing problem of cable services theft. It wanted to craft a strong cable-specific theft statute while retaining the existing pre-1984 protections to radio-based cable signal theft under § 605 that had been litigated in various forums. Congress was found to have taken a strikingly similar approach in providing for overlapping coverage between § 605(e)(4) and the wiretapping statute, 18 U.S.C. § 2512(1)(b).[30] It defies belief, the express statements of the Committee Report and individual legislators,[31] and longstanding statutory interpretation principles,[32] to believe that Congress would deliberately have chosen in 1984 to put all of its eggs in the new and untried § 553 basket while it had available a developing case law under § 605 as well.

### D.    Conclusion

Accordingly, the Court should reconsider its Memorandum holding that § 605 is not available to cable operators with respect to their communications over cable wires.

---

[29]    Memorandum at 12 (citing <u>TKR Cable</u>, 267 F.3d at 203-05).

[30]    See <u>Crawford</u>, 52 F.3d 1303.

[31]    See 130 Cong. Rec. H10439 (daily ed. Oct. 1, 1984) and 98 Cong. Rec. 514287 (daily ed. Oct. 11, 1984) (statement of Rep. Wirth); 130 Cong. Rec. S14285 (daily ed. Oct. 11, 1984) (statement of Sen. Packwood), reprinted in 1984 U.S.C.C.A.N. 4738, 4746.

[32]    <u>Lorillard</u>, 434 U.S. at 580-81 (internal citations omitted); see also <u>Shapiro</u>, 335 U.S. at 16.

11

Rather than committing cable operators exclusively to § 553, Congress left in place the different but overlapping protections provided by § 605. If not reconsidered, the Memorandum should not have cast aside this policy choice made by Congress 20 years ago.

## II.    The Court's Discussion on Damages Provides Useful Guidance But Requires Refinement to Ensure Adequate Restitution to Charter.

### A.    Introduction

In its Memorandum, the Court seeks to develop guidelines for assessing the alternative remedy of "statutory" damages against defaulting cable signal theft defendants under § 553(c)(3)(A)(II) where Charter elects not to plead and prove its "actual" damages under § 553(c)(3)(A)(I).[33] Charter agrees with the Court's analysis finding "willfulness" and awarding reasonable attorneys' fees.[34] Charter also commends the Court for seeking to fashion precedential guidelines for the future in assessing statutory damages "as it deems just."[35] Nevertheless, Charter requests that the Court revisit its proposed principles for assessing statutory damages. For the reasons discussed below, Charter provided very strong support for its request seeking that the maximum statutory damages of $10,000 be assessed against each defendant, including in each case a supporting affidavit that

---

[33]    Memorandum at 13. The statutory counterpart provision under 47 U.S.C. § 605 is subsection (e)(3)(C). As set forth in Section I above, Charter's § 605 claims should be allowed and the Court can apply similar damages guidelines discussed below.

[34]    Memorandum at 20-23. Charter plans to separately file the requested explanation of the basis for its attorneys' fees request within the time period set by the Court.

[35]    47 U.S.C. § 553.

detailed the loss of services and other harms experienced by Charter relating to the theft.[36]

Comments in the Memorandum that Charter failed to make such a showing (e.g.,

Memorandum at 17) fail to take into account the evidentiary materials filed in support of

the Charter's Motions for Default.  Additionally, the decision to determine statutory

damages based on estimating "actual damages" to the operator -- narrowly defined as an

estimate of the defendants' use of video services, relying on Judge Keeton's decision in

Naranjo as persuasive authority [37] -- is problematical.  Charter would recommend that the

Court return to its prior practice of presumptively awarding statutory damages in the

maximum amount of $10,000, especially when an operator provides reasonable support

that its total damages -- both uncompensated video services and other direct and indirect

harms -- are close to or in excess of the statutory amount.[38]

### B. Overview of Past Practices in the Central Division of the District Court.

The Memorandum does not discuss this Division of the District Court's extensive

precedent with respect to damages awards to Charter in similar cases.[39]  Charter's anti-

---

36    See Affidavit of Mary Paul, Charter's Inventory Operations Manager, filed as Exhibit A to Plaintiff's Motion for Judgment of Default with respect to each defendant.

37    Comcast of Massachusetts I, Inc. v. Naranjo, 303 F. Supp. 2d 43 (D. Mass. 2004).

38    See, e.g., Community Television Sys. v. Caruso, 134 F. Supp. 2d 455 (D. Conn. 2000).

39    See, e.g., Charter v. Djan, No. 03-40060, slip op. at 1 (D. Mass. Oct. 24, 2003); Charter v. Mroczka, No. 03-00009, slip op. at 1 (D. Mass. July 9, 2003); Charter v. Srams, No. 02-40108, slip op. at 1 (D. Mass. May 28, 2003); Charter v. Rumrill, No. 02-40220, slip op. at 1 (D. Mass. Apr. 16, 2003); Charter v. Maldonado, No. 02-40221, slip op. at 1 (D. Mass. Apr. 16, 2003); Charter v. Rubert, No. 02-40132, slip op. at 1 (D. Mass. Jan. 27, 2003); Charter v. DeFilippo, No. 01-40222, slip op. at 1 (D. Mass. Sept. 26, 2002); Charter v. Kessler, No. 02-40054m slip op. at 1 (D. Mass. Aug. 13, 2002); Charter v. Wayne, No. 02-40026, slip op. at 1 (D. Mass. May 10, 2002); Charter v. Tetrault, No. 01-40120, slip op. at 1 (D. Mass. Apr. 5, 2002); Charter v. Estrada, No. 01-40171, slip op. at 1 (D. Mass. Mar. 6, 2002); Charter v. Duggan, No. 01-40093, slip op. at 1 (D. Mass. Jan. 24, 2002); Charter v. Fairbanks, No. 01-40149, slip op. at 1 (D. Mass. Dec. 5, 2001); Charter v. Pantoja, No. 01-40148, slip op. at 1 (D. Mass. Dec. 5, 2001) (awarding maximum amount of statutory damages plus costs and reasonable attorneys' fees) (copies are

theft program in Massachusetts entered an especially active phase over four years ago.
After exhausting all efforts to resolve individual cases against a potential defendant
without resorting to litigation, Charter has been compelled to file lawsuits with the
District Court in this Division under § 553 or, in some cases, under both § 553 and § 605,
many of which have resulted in entry of default and, eventually, default judgments.
Charter's practice, employed with respect to each of these defendants, is to prepare a
detailed submission in support of requests for default judgments to assist the Court. The
filing package includes an affidavit from a Charter manager (here, Mary Paul, Exhibit A
to each Motion for Default) who reviews the specific facts of each case with legal
counsel and quantifies an estimate of the potential monetary and non-monetary damages
resulting from the theft of services in question.

During this time, the Court in this Division, in considering a default judgment
motion, has never once limited Charter to an adjustment of actual damages when the
Complaint pleads and seeks the election of statutory damages under § 553(c)(3)(A)(II)
rather than seeking to prove actual damages under § 553(c)(3)(A)(I). In those cases that
have not been resolved by way of settlement, the Court has granted maximum statutory
damages of $10,000 with respect to defaulting defendants.[40] Charter supports this
approach on legal, policy and practicality grounds, and urges the Court to use the
maximum statutory damages as the presumptive starting point rather than estimated

---

attached hereto as Exhibit A). Tetrault, Kessler, and DeFilippo all included a § 605 judgment in addition to
a judgment under § 553.

40    Id.

actual damages, for the reasons stated in the following section.[41]  Additionally, the instant

cases before the Court differ in important ways from the issues raised in the Naranjo case

and merit a different analysis and result.

### C.  An Award of Maximum Statutory Damages Better Comports with Statutory Requirements and Policies

Charter requests that the Court re-consider the approach of calculating statutory

damages based on an estimate of damages for four principal reasons.

First, reliance on the narrow definition of actual damages adopted in Naranjo

conflicts with the letter and spirit of the damages statutes in both §§ 553 and 605.  Both

statutes permit the aggrieved party the option of whether to plead and prove actual

damages in any amount, or alternatively to seek statutory damages in an amount

established by the Court up to $10,000.  The underlying rationale for the statutory

damage is clear.  As cable and satellite television are not metered services and as theft

imposes a host of hard to quantify but real costs, an aggrieved cable operator could have

difficulty determining its "true" damages resulting from the theft.[42]  Moreover, pleading

and proving damages with respect to an individual defendant can be administratively

inefficient and costly.  Given the express election conferred by statute and the relevant

underlying principles, it is disconcerting for a cable operator to choose the statutory

election not to prove actual damages and, nevertheless, be compelled to do so anyway in

order to establish a basis for the award of statutory damages.

---

[41]    In the event a defendant can establish the violation was innocent or otherwise offers grounds that justify a lower discretionary award, the Court could assess different damage amounts.  47 U.S.C. § 553(c)(3)(C); 47 U.S.C. § 605(c)(3)(C)(iii).

[42]    See King Vision Pay-Per-View LTD. v. Hansen, 2004 U.S. Dist. LEXIS 6262, at *6 (S.D.N.Y. April 5, 2004)  (internal citations omitted)  ("Statutory damages are appropriate when actual damages are difficult to prove").

Second, the predominant theory that underlies the remedies provisions in

§§ 553 and 605 is not damages but, rather, is restitution.[43]  Cable theft causes harms to the

cable operator and its physical network that far exceed the value of the "damages"

narrowly measured in terms of the specific cable television services stolen.  These items,

which are itemized below, properly should be taken into account in ensuring that

statutory damages provide the affected operator full or at least adequate restitution for its

harms:  (1) loss of the full market value of a fully legitimate customer, which can range

from $3,000 to over $5,000 per subscriber depending upon various factors, including

cash flow based on the cable operator's revenue stream; (2) physical damage to, or

technical problems with, the cable system caused by unauthorized connections, including

signal leakage and its adverse impact on certain radio frequencies, and safety problems at

the utility pole or within a multi-family dwelling unit; (3) good will with its legitimate

customers when a person takes steps to receive cable service without authorization,

insofar as legitimate customers, whether friends, family or acquaintances of the cable

thief, often will gain knowledge of the unauthorized reception and hold the Company

directly or indirectly responsible; (4) costs associated with working with the Office of

Cable Signal Theft of the National Cable & Telecommunications Association, which

serves as a clearinghouse for the distribution of the business records demonstrating the

order, purchase and delivery of illegal theft devices, and with District Attorneys or other

local officials on criminal matters; and (5) operational support to the legal team retained

to vindicate Charter's rights.  Virtually none of those costs would be recovered in an

---

[43]     See Storer Cable Communications, Inc. v. Joe's Place Bar & Rest, 819 F.Supp. 593 (W.D. Ky.
1993).

award based solely on actual damages.   Charter suggests that the statutory minimum of

$10,000 is a reasonable proxy for the harms suffered from cable thieves.

Third, the over-focus on actual damages fails to adequately account for the need

for deterrence with respect to persons considering cable theft in the future.[44]  Deterrence

is at least an implicit consideration in deciding the discretionary amount of statutory

damages under § 553(c)(3)(A)(II).   In 1984, the definitive House Report found that:

> Theft of service is depriving the cable industry of millions of
> dollars of revenue each year which it should otherwise be
> receiving.  The Committee [on Energy and Commerce] believes
> that theft of cable service poses a major threat to the economic
> viability of cable operators and cable programmers, and creates
> unfair burdens on cable subscribers who are forced to subsidize the
> benefits that other individuals are getting by receiving cable
> service without paying for it.[45]

Since then, factual testimony has been developed that the loss in the aggregate to

the cable industry is in the billions of dollars.[46]  A study that is being released by the

NCTA this month will estimate that industry losses now exceed $7 billion annually.  By

not factoring deterrence, the Memorandum has unnecessarily limited the Court, as well as

Charter, in a manner that is not consistent with the purposes of these statutes.  If the

Congress found that the "problem [of cable theft was] of such severity that the Federal

penalties and remedies . . . must be available in all jurisdictions (and enforcement in state

---

[44]     Note that the Naranjo focus on deterrence is too limited, and does not clearly address the role of
deterrence on the general public, as discussed below in Section D.

[45]     H.Rep. No. 98-934, at 83, reprinted in 1984 U.S.C.C.A.N 4655, at 4720.

[46]     Based on a 2000 survey of cable television operators of losses resulting from signal theft, the
NCTA's Office of Cable Signal Theft reported that theft-of-service translates into over $6.5 billion in
unrealized revenue annually, or almost 17% of the estimated cable industry gross revenues in 2000.
Material available at <ncta.com/Docs/PageContent.cfm?pageID=293>.

or Federal court) as part of the arsenal necessary to combat this threat," it is difficult to reconcile the Memorandum's statement that deterrence should not be considered by the Court "as it deems just" in determining statutory damages.[47]

Finally, contrary to the Memorandum (at 26-27), the Court's findings regarding enhanced damages for "willfulness" and its award of attorneys' fees do not adequately address the harms to the cable operators and their customers. The attorneys' fee awards provide an important incentive to the operators to bring civil actions but are revenue neutral to the operator. The enhanced damages, while certainly helpful,[48] cover only a portion of the hard-to-quantify costs that go well beyond the mere loss of potential video revenues from theft and, as such, do not adequately deter illegal conduct.

### D.    The Naranjo Case Is Factually Distinguishable and Should Not Be Relied on as Precedent With Respect to Charter.

The Court's heavy reliance on Naranjo ignores differences that distinguish that case before Judge Keeton in Boston and the instant case in this Division, which support a different result.

Probably due to the case as it was presented to Judge Keeton, the Naranjo Decision has analytical errors that should limit its application. As discussed in the preceding section, the Naranjo Court's exclusive focus on video services ignores additional costs and harms to the operator that should be taken into account in assessing statutory damages. Additionally, Judge Keeton asserted that the request for injunctive

---

[47]    H.Rep. No. 98-934, at 84, reprinted in 1984 U.S.C.C.A.N 4655, at 4720.

[48]    Memorandum at 27 (the Court adopted the position that a $1,000 enhanced damages penalty was appropriate for each defendant).

relief with respect to the defendant served the purpose of "deterring future violations."[49]
The Naranjo court was correct that the granting of injunctive relief would serve the
purpose of specific deterrence against the defendants at bar, but ignores that such relief
does not further the interests of deterrence with respect to the general public at large,
including other cable subscribers, contrary to the purposes of Sections 553 and 605.[50]

An additional difference is that Charter provided consistent and detailed materials
in support of its request of statutory damages, including damage estimates and inclusion
of the date of box purchase.[51] Accordingly, unlike Naranjo, maximum statutory damages
can be easily granted based on the record before the Court. Additionally, while the Court
indicated it attributed "no special significance" to the multiple errors and inconsistencies
it found in the operator's findings in Naranjo[52] it appears clear that Judge Keeton's
approach was influenced by these presentation issues, which should not be attributed to
Charter.

---

[49]    Naranjo, 303 F. Supp. 2d at 48-49.

[50]    Note that the reach of cable theft goes beyond harm solely to the operator. See, e.g., C&D Elecs.,
Inc., FTC Docket No. C-3212 (1987) ("The cost of stolen cable services is initially borne by the cable
companies, the premium cable services, and the municipalities that grant cable franchises. There is little
doubt, however, that most of all of those costs are passed along to honest cable service subscribers in the
form of higher prices.") (separate statement of Chairman Oliver, at 1).

[51]    See Naranjo, 303 F. Supp. 2d at 45, 47) (noting inconsistencies in the requested amounts and
noting lack of box purchase detail); but see, Caruso, 134 F. Supp. 2d 455 (awarding maximum statutory
damages based on adequate supporting detail) (Lead counsel for Charter in the present action was counsel
for Community Television Systems in Caruso and employed a similar approach for supporting damages).

[52]    Naranjo, 303 F. Supp. 2d at 45.

**Conclusion**

For all these reasons stated in Sections I and II above, the Court should reconsider (1) its decision that § 605 is unavailable to cable television operators, and (2) the proposed approach of establishing statutory damages based on an estimated reasonable value of damages from video services experienced by the cable operator.

> CHARTER COMMUNICATIONS
> ENTERTAINMENT I, LLC d/b/a
> CHARTER COMMUNICATIONS,
>
> By: _____
> Burton B. Cohen, BBO#656190
> Robert J. Munnelly, Jr., BBO#555202
> Murtha Cullina LLP
> 99 High Street, 20th Floor
> Boston, MA 02110
> (617) 457-4000
> Its Attorneys

Dated: January 25, 2005

20